**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **Michael A. Hughes,** | ) | **CASE NO. 1:05 CV 1403** |
| | ) | |
| **Plaintiff,** | ) | **JUDGE PATRICIA A. GAUGHAN** |
| | ) | |
| vs. | ) | |
| | ) | |
| **Madison Local School District,** | ) | **Memorandum of Opinion and Order** |
| **Board of Education,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**INTRODUCTION**

This matter is before the Court upon Defendant Madison Local School District Board of Education's Motion For Summary Judgment (Doc. 12). This is an employment discrimination case. For the reasons that follow, the motion is GRANTED.

**FACTS**

Plaintiff, Michael Hughes, filed this action against defendant, Madison Local School District Board of Education, seeking damages after his teaching contract was not renewed by the school.

1

The facts of this case are largely undisputed. Plaintiff was employed by defendant as a sixth grade science teacher pursuant to a "limited contract." Limited contracts arise under the Ohio Revised Code and are for a specific duration. Plaintiff's contract expired by its terms after the 2003-2004 school year. Upon expiration, limited contracts may or may not be renewed. The collective bargaining agreement provides for teacher evaluations in order to assist defendant in determining whether to renew plaintiff's contract.

On December 12, 2003, Holly Lepisto, the middle school principal and plaintiff's immediate supervisor, observed plaintiff teach during two class periods. As a result of the observation, Lepisto issued plaintiff a written evaluation finding him deficient in a number of areas. In the comments section, Lepisto indicated the following deficiencies, among others:

- Failure to articulate clear learning goals;

- Unpreparedness, i.e., plaintiff presented the class with an experiment, but failed to have the objects necessary for a "hands on" lesson;

- Unsafe learning environment/humiliation, i.e., plaintiff required a student to do push-ups in front of the class as a result of completing an assignment slower than the other students;

- Insubordination, i.e, after receiving parent complaints, plaintiff had been warned not to require students to do push-ups;

- Absenteeism, i.e., plaintiff missed eight work days during the first half of the school year;

- Negative attitude, i.e., plaintiff acts defensively and interacts unprofessionally with Lepisto by raising his voice

Plaintiff expressed disagreement over this evaluation and, on January 8, 2005, a meeting was held between plaintiff, Lepisto, assistant principal Kay Billington and plaintiff's union representative. During the meeting, plaintiff became confrontational, claiming that the

evaluation was inaccurate and failed to properly credit his teaching abilities. After some negotiation, plaintiff's union representative inquired as to whether Lepisto would be willing to "throw out" the evaluation and re-evaluate plaintiff's teaching abilities. Lepisto agreed and plaintiff's union representative attempted to convince plaintiff to proceed in this fashion. According to the testimony of Lepisto, plaintiff and his union representative were "screaming and yelling" at each other behind closed doors and, ultimately, plaintiff refused to agree to be re-evaluated.

The following day, plaintiff came to work and taught his first period class. Immediately following first period, plaintiff submitted to Lepisto the following resignation letter,

> To make things easier for everyone I (sic) would like to give you my resignation. I have way too many deficiencies in my teaching and believe that I am truly a detriment to the students at Madison Middle School. I also believe that it will be nearly impossible for me to "do what is needed" just to get a better evaluation for Mrs. Lepisto, especially since I do not know what is wrong. Unfortunately my mind works differently than everyone else's. I am sorry for the inconvenience.

Plaintiff returned to his classroom to collect his belongings and left the building. Lepisto had to obtain temporary coverage for his classroom until such time as a substitute teacher could be arranged.

The following day, plaintiff admitted himself to Laurelwood Hospital. Four days later, plaintiff withdrew his letter of resignation and requested sick leave, which defendant accepted. Plaintiff participated in a partial hospitalization program at Laurelwood from February 4, 2005 through February 25, 2004 and, although unclear, it appears that plaintiff received sick pay from defendant for his entire absence. In addition, defendant placed plaintiff on leave pursuant to the Family Medical Leave Act.

Before allowing plaintiff to return to work, defendant required a release signed by

3

plaintiff's treating physician indicating that he was capable of performing his duties without restriction. Plaintiff submitted at least two releases and, eventually, defendant accepted the documentation provided. In addition, as a condition of his return, defendant required that plaintiff comply with a written growth plan. As part of the plan, plaintiff had to document his efforts to improve as a teacher and correct performance deficiencies. Plaintiff submitted the following response,

**List 5 different ways you will use positive reinforcement:**

1. I will tell the students "good job" after correctly answering a question.

2. I will say "close...but not quite enough" if the student gives an answer that doesn't quite answer the question.

3. I will say "no, but thank you for trying" if a student gives an incorrect answer.

4. If a student breaks something I will tell them, "That's ok, we all make mistakes. Get another one and try the lab again." Even if the student is misusing the equipment (sic).

5. If a student forgets his science materials, class-work, or homework I will say, "That's ok, you take as much time as you need to finish what we are doing in class today."

**List at least three ways that you will appropriately handle discipline in your classroom (these cannot involve the humiliation of a student as a tactic).**

1. If a student is talking when they (sic) are not supposed to (ie. (sic)When I am giving directions) I will stop what I am doing, go over to the student, and quietly ask them (sic) to stop.

2. If the above mentioned does not work I will stop class again to quietly ask them to stop.

3. If the talking still persists I will allow the student to continue disrupting class and turn the problem over the office by writing a discipline referral form.

**[Provide a] written plan that details how you are going to control your temper. This plan should include ways that you will collaborate with your colleagues in positive**

**ways and ways that you are going to positively communicate with parents.**

1. The way I am going to control my temper is when I get into a situation where I am becoming out of control angry, I will stop, close my eyes, and pray to the Virgin Mary for the strength and patients (sic) to control myself.  Along with asking for divine intervention from the mother of God, I will say 5 Hail Marie's (sic), and 5 Our Fathers.

2. Another way I am going to control my out of control rage, is to stay away from the things at school that make my temper get out of control.  For example, I will not talk to my administrator unless it is absolutely necessary and cannot be avoided since that is the only time my temper has been displayed in the eight years that I have been teaching at Madison Middle School.

3. I will positively collaborate with my colleagues by simply agreeing with everything they say, (sic) and suggest, even if it has a negative impact on me, my classroom, or the way I teach.

4. I will positively communicate with parents by doing whatever makes them happy, even if it involves changing the rules for everyone because of their child.

This fulfills the requirements of my growth plan.

Lepisto was shocked by plaintiff's sarcastic and inappropriate response to the growth plan and encouraged him not to send it to the superintendent.  Plaintiff nonetheless submitted the response.  Several days later, plaintiff resubmitted a more appropriate response.  Ultimately, the superintendent recommended that plaintiff's limited contract not be renewed and the Board of Education unanimously approved that recommendation.

Thereafter, plaintiff filed this lawsuit asserting five causes of action.  Count one is a claim for violation of the American with Disabilities Act.  Count two alleges a violation of the Ohio Civil Rights Act.  Counts three and four allege interference and retaliation with the rights provided under the Family Medical Leave Act.  Count five is a claim for violation of Ohio's public policy.  Defendant moves for summary judgment on all claims.  Plaintiff opposes the motion.

**STANDARD OF REVIEW**

In accordance with Federal Rule of Civil Procedure 56(c), summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 378 (6th Cir. 1993). The burden of showing the absence of any such genuine issues of material facts rests with the moving party:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrates the absence of a genuine issue of material fact.

*Celotex*, 477 U.S. at 323. A fact is material only if its resolution might affect the outcome of the lawsuit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Once the moving party has satisfied its burden of proof, the burden then shifts to the nonmoving party pursuant to Federal Rule of Civil Procedure 56(e), which provides:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleadings, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

In ruling upon the motion, the court must afford all reasonable inferences and construe the evidence in the light most favorable to the nonmoving party. *Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995); *United States v. Hodges X-Ray, Inc.*, 759 F.2d 557, 562 (6th Cir. 1985). However, summary judgment should be granted if the party bearing the

burden of proof at trial does not establish an essential element of its case. *Tolton v. American Biodyne, Inc.*, 48 F.3d 937, 941 (6th Cir. 1995) (citing *Celotex*, 477 U.S. 317).

## **ANALYSIS**

1.　　　Disability discrimination (counts one and two)

Plaintiff alleges defendant terminated him in violation of both federal and state disability discrimination laws. Both state and federal disability claims are generally analyzed under the same framework. Accordingly, these claims will be considered together. *See, Hoffman v. Fidelity Brokerage Servs., Inc.*, 959 F.Supp. 452, 457 n. 1 (S.D. Ohio 1997) ("The essential elements of a claim under the ADA and the Ohio handicap discrimination statute are the same").

The ADA protects qualified individuals with disabilities from discrimination. 42 U.S.C. § 12112. A qualified individual is one "with a disability who, with or without accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).

> The disability of an individual is defined broadly under the ADA to include:
>
> > (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
> >
> > (B) a record of such an impairment; or
> >
> > (C) being regarded as having such an impairment.

42 U.S.C. § 12102(2).

In this case, plaintiff does not claim that he is actually disabled. Rather, plaintiff argues that he qualifies for protection under the statute because defendant regarded him as disabled. Plaintiff points to the following evidence in support of his position:

- Plaintiff's deposition testimony in which he avers that the superintendent told him that he was afraid plaintiff might "go off" on students or fellow teachers;

- An affidavit from plaintiff's father in which he states that the former superintendent told him that it did not look good for defendant to have a teacher on staff who treated at a mental health facility like Laurelwood;

- An affidavit from plaintiff's mother wherein she avers that Mayor, a former member of the Board of Education, told her that, although the Board did not know why plaintiff had gone to Laurelwood, the Board assumed that it was due to a drug or alcohol problem. In addition, she testifies that Mayor told her that the Board considered the fact that plaintiff went to Laurelwood in determining not to renew his contract;

- Although not directly relied upon, plaintiff refers to the testimony of Lepisto and Billington, who state that the superintendent told them that there was "more going on" with plaintiff other than the growth plan he filled out.

Upon review of the relevant law, the Court finds that defendant is entitled to summary judgment on plaintiff's "regarded as disabled" claim. To succeed on this claim, plaintiff must prove that defendant regarded him as disabled as that term is defined by the ADA. *See Ross v. Campbell Soup Co.*, 237 F.3d 701, 709 (6th Cir. 2001) ("It is not enough...that the employer regarded that individual as somehow disabled; rather, the plaintiff must show that the employer regarded the individual as disabled *within the meaning of the ADA*.") (quoting *Colwell*, 158 F.3d 635). In order to establish that he was regarded as having such an impairment, plaintiff must show that his impairment was treated by defendant as substantially limiting a major life activity. 29 C.F.R. § 1630.2(l).

As recently held by the Supreme Court,

> There are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. In both cases, it is necessary that

8

> a covered entity entertain misperceptions about the individual–it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting.

*Sutton*, 527 U.S. at 489.

In this case, plaintiff wholly fails to identify the specific impairment defendant mistakenly attributed to plaintiff. Plaintiff does not distinguish between the two types of proof set forth in *Sutton*. Rather, plaintiff appears to suggest that defendant mistakenly believed plaintiff suffered from either mental health issues or substance abuse problems. It is unclear whether plaintiff is claiming that he suffers from a nonlimiting mental health/substance abuse issue or whether he in fact does not suffer from any impairment. Regardless, the Court finds that plaintiff fails to present sufficient evidence from which a reasonable jury could conclude that defendant regarded plaintiff as disabled. Although plaintiff presents some evidence suggesting that defendant mistakenly believed he had mental health issues, other evidence suggests that defendant believed plaintiff suffered from a substance abuse problem. Thus, plaintiff is unable to articulate what limitation defendant mistakenly believed plaintiff suffered from. Obviously, mental health issues are not coterminous with substance abuse problems.

Regardless, the evidence relied on by plaintiff is insufficient to create a genuine issue of material fact as to whether defendant regarded plaintiff as suffering from an impairment. Although plaintiff testified that the superintendent told him that he feared plaintiff may "go off" on students or faculty, this statement says nothing about whether defendant perceived plaintiff as suffering from an impairment. An employee may "go off" on co-workers for any number of reasons. Thus, absent additional evidence suggesting that the superintendent based his assessment on a perceived impairment, the Court finds that this evidence does not create a

9

question of fact as to whether defendant believed that plaintiff suffered from an impairment.  For the same reasons, the Court finds plaintiff's reliance on the testimony of Lepisto and Billington misplaced.  Although both testified that the superintendent informed them that there was "more going on," there is no suggestion that the "more going on" was in any way related to a perceived impairment.

As a result, plaintiff is left with the affidavits presented by his parents.  Defendant argues that the Court cannot rely on these affidavits because they constitute inadmissible hearsay.  Regardless of whether the hearsay rule applies, the Court finds that the evidence is insufficient to create a genuine issue of material fact as to whether defendant regarded plaintiff as suffering from an impairment.  Plaintiff's father avers that the former superintendent told him that defendant was concerned about plaintiff's admission to Laurelwood because it "didn't look good" for the school.  There is no evidence, however, suggesting that the former superintendent was involved in any way in the decision not to renew plaintiff's contract.[1]  The sole piece of remaining evidence is the affidavit provided by plaintiff's mother, wherein she states that a member of the Board of Education told her that the Board did not know why plaintiff was admitted to Laurelwood, but that the members assumed it was due to a drug and/or alcohol problem.  Standing alone, this evidence is insufficient to create a genuine issue of material fact as to whether defendant believed plaintiff had an impairment.  Again, plaintiff himself fails to clearly articulate the nature of the impairment and the self-serving affidavit submitted by

---

[1] The Court further agrees with defendant that the statement is inadmissible hearsay.  While admissions against interest are not considered hearsay, there is no indication that the former superintendent had the requisite authority to bind defendant at the time the statement was made.

10

plaintiff's mother does not indicate that defendant believed plaintiff actually suffered from a drug and/or alcohol problem. Rather, the statement made by the Board member simply attempts to explain the reason for plaintiff's hospitalization at Laurelwood.

Even assuming plaintiff clearly articulated a limitation, plaintiff fails to present any evidence indicating that defendant treated the impairment as substantially limiting a major life activity. In passing, plaintiff claims that certain "preconceived notions regarding [plaintiff's] ability to work support the conclusion that he was regarded as being disabled." Based on this statement, the Court presumes plaintiff is alleging that defendant treated his impairment as substantially limiting the major life activity of working. In order to succeed on his claim, however, plaintiff must introduce evidence showing that defendant "regarded him as unable to work in a broad class of jobs or a broad range of jobs in various classes." *Moorer v. Baptist Memorial Health Care Sys.*, 398 F.3d 469, 481 (6th Cir. 2005). The Sixth Circuit has recognized that this is an extraordinarily difficult task because "it is safe to assume employers do not regularly consider the panoply of other jobs their employees could perform, and certainly do not often create direct evidence of such considerations." *Id*. (quoting *Ross v. Campbell Soup Co.*, 237 F.3d 701 (6th Cir. 2001)).

> [W]here there is substantial evidence that an individual's medical status played a significant role in an employer's decision to [take adverse action], combined with evidence that the employer concocted a pretextual reason justification for [the adverse action], the need for more extensive factual inquiry into whether the employer engaged in unlawful discrimination is especially acute.

*Ross*, 237 F.3d at 709.

Plaintiff does not claim that, based on this alleged misperception, defendant believed that he could not perform the functions of working as a teacher or working in general. In addition,

11

plaintiff fails to point to "substantial evidence" that his medical status played a significant role in defendant's decision not to renew his contract. Although plaintiff points out that a board member told his mother that the board considered his hospitalization in making their decision, the Court finds that an affidavit from plaintiff's mother does not amount to "substantial" evidence required under *Ross*. Not only does plaintiff fail to point to substantial evidence suggesting that his medical status affected defendant's decision, plaintiff offers no additional evidence that the reason for nonrenewal was pretext. Plaintiff admittedly required students to do "push ups" in front of the class during an evaluation, even after having been warned that such behavior is against school policy. In addition, plaintiff resigned in the middle of the workday, requiring the principal to find coverage for his classroom on a moment's notice. Then, after rescinding his resignation, plaintiff thumbed his nose at the conditions of his return to employment by submitting a grotesquely inappropriate response to the growth plan. In light of this evidence, the Court finds that plaintiff fails to demonstrate that defendant "concocted" a reason for his termination in order to mask illegal discrimination. In all, plaintiff fails to present sufficient evidence under *Ross* to create a question of fact as to whether defendant believed that plaintiff was limited in the major life activity of working and, as such, plaintiff is not disabled for purposes of the ADA and the Ohio Civil Rights Act. Summary judgment in favor of defendant is warranted.

    2.    FMLA claims (counts three and four)

In counts three and four, plaintiff alleges interference and retaliation with the rights provided under the Family Medical Leave Act. In his brief in opposition, plaintiff fails to respond to the arguments presented by defendant with regard to the interference claim and,

12

instead addresses only the retaliation claim. Accordingly, the Court finds that plaintiff has abandoned count three and summary judgment in favor of defendant is appropriate. The Court will address the parties' arguments as they relate to the retaliation claim.

Pursuant to 29 U.S.C. §§ 2612(a)(1)(C) and (D), plaintiff is "entitled to a total of 12 workweeks of leave during any twelve month period... in order to care for the...parent of the employee [suffering from] a serious health condition..." or "because of a serious health condition that makes the employee unable to perform the functions of the position of such employee." "An employer may not retaliate against an employee for taking leave under the FMLA." *Spurlock v. Peterbilt Motors Company, Inc.,* 58 Fed. Appx. 630 (6th Cir. Feb. 19, 2003) (citing 29 U.S.C. § 2615; 29 C.F.R. § 825.220(c)). Where a former employee alleges that she was terminated for exercising her rights under the FMLA, the Court applies a traditional employment discrimination analysis.

In this case, plaintiff does not argue that there is direct evidence in support of her claim and concedes that the *McDonnell Douglas* burden-shifting analysis applies to his FMLA claim. *Gibson v. City of Louisville,* 336 F.3d 511 (6th Cir. 2003). Thus, plaintiff must first establish a prima facie case by showing

> (1) he availed himself of a protected right under the FMLA. (2) he was adversely affected by an employment decision ..., and (3) the proximity in time between [the] request for leave and [the adverse employment action establishes] a causal connection between his exercise of a right under the FMLA and the adverse employment decision.

*Watkins v. Hill's Pet Nutrition, Inc.,* 63 Fed. Appx. 185 (6th Cir. April 8, 2003) (citing *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 314 (6th Cir. 2001)).

If plaintiff is able to establish a prima facie case, the burden shifts to defendant to articulate a legitimate nondiscriminatory reason for the adverse employment action. Once this

13

burden is satisfied, the burden shifts back to plaintiff, who must then present evidence that the proffered reason was in fact pretext for unlawful discrimination. *Gibson,* 336 F.3d at 513 (*citing Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153-54 (2000)). The plaintiff need not prove that discrimination was the sole factor motivating the adverse action. Rather, plaintiff need only demonstrate that it was "*a* determining and motivating factor." *Id*. at 514 (emphasis in original).

The Court now turns to whether plaintiff presented sufficient evidence to establish a prima facie case of retaliation in violation of the FMLA.

Defendant argues that plaintiff cannot establish a prima facie case because plaintiff did not avail himself of FMLA leave. Rather, plaintiff asked for sick leave and defendant unilaterally placed him on FMLA leave. As such, defendant claims plaintiff cannot establish the first element of the prima facie case. Plaintiff disputes this contention, although he fails to present any specific argument. Rather, it appears that plaintiff claims that the first element is satisfied because defendant placed plaintiff on FMLA leave. Defendant further argues that plaintiff cannot establish a causal connection between the exercise of his FMLA rights and the failure to renew his contract. Defendant claims that the decision not to renew plaintiff's contract came "shortly after" he returned from FMLA leave.

Assuming *arguendo*, that defendant's treatment of plaintiff's request for sick leave as FMLA leave satisfies the first prong of the prima facie case, the Court finds that plaintiff fails to present sufficient evidence from which a jury could conclude that a causal connection exists between the failure to renew plaintiff's contract and his leave of absence. Prior to taking sick leave, plaintiff resigned from his employment and abruptly left defendant without a teacher for

14

his classroom. While on leave, plaintiff rescinded his resignation. Defendant accepted the recision and placed plaintiff on leave. A condition of plaintiff's return included the preparation of a growth plan. As set forth above, the response to the growth plan was, to say the least, sarcastic and remarkably unprofessional. Only afer the submission of the growth plan did the Board decide not to renew plaintiff's teaching contract for the following year. That decision was made nearly two months after plaintiff returned from leave. Moreover, plaintiff was permitted to finish out the teaching year. Based on these facts, the Court finds that no reasonable juror could conclude that a causal connection exists between the exercise of FMLA leave and the non-renewal of plaintiff's teaching contract.

Even assuming a causal connection exists, the Court finds that plaintiff fails to present sufficient evidence of pretext to overcome defendants legitimate non-discriminatory reason for deciding not to renew plaintiff's contract. Defendant claims that the decision came a result of the submission of the growth plan, which, among other things, demonstrated that plaintiff was "snubbing his nose" at the entire improvement process. In response, plaintiff again points to the affidavit from his mother, who avers that a Board member told her that the Board had considered the fact that plaintiff had taken a leave of absence when determining not to renew his contract. Standing alone, and in the face of plaintiff's own actions leading up to non-renewal, the Court finds that the affidavit submitted by plaintiff's mother is insufficient to create a question of fact on the issue of pretext. As an initial matter, defendant claims that this testimony is inadmissible and plaintiff makes no argument in response. Moreover, the affidavit speaks in conclusory terms without providing any information from which the Court can ascertain the admissibility of the

15

evidence.[2]  Even considering the affidavit, the overwhelming evidence demonstrates that the proferred reason for termination is not pretext for illegal discrimination.  Plaintiff himself admits that the growth plan was "sarcastic and inappropriate."  In addition, plaintiff resigned abruptly and abandoned his classroom in the middle of the workday.  Given plaintiff's poor evaluation and his insubordination, i.e., requiring students to do "push-ups" as a punishment after defendant instructed him not to, the Court finds that the affidavit submitted by plaintiff's mother is insufficient to rebut plaintiff's legitimate non-discriminatory reason for termination.  As such, defendant is entitled to summary judgment.

       3.      Violation of public policy

Count five asserts a claim for violation of Ohio's public policy.  Although defendant moves for summary  judgment on this claim, plaintiff fails to respond to defendant's arguments.  Accordingly, the Court finds that plaintiff has abandoned count five and summary judgment in favor of defendant is warranted.

**CONCLUSION**

For the foregoing reasons, Defendant Madison Local School District Board of

---

[2]    For example, while admissions against interest are not hearsay, the affidavit provided by plaintiff's mother indicates that she had a conversation with Mayor, a "former" board member.  It is not clear whether the conversation occurred while Mayor was still a member of the board.  Thus, it is impossible for the Court to ascertain whether Federal Rule of Evidence 801(d)(2)(D) applies.  In addition, the Court is not convinced that Mayor's statement could bind defendant in any event.

Education's Motion For Summary Judgment is GRANTED.

IT IS SO ORDERED.

      /s/ Patricia A. Gaughan
PATRICIA A. GAUGHAN
United States District Judge

Dated: 5/11/06